Filed 4/5/23  P. v. Jackson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>STEPHEN RENEE JACKSON,<br><br>Defendant and Appellant. | C095988<br><br>(Super. Ct. No. 19FE020421) |

Defendant Stephen Renee Jackson broke through a car window to stab his ex-partner's lover to death.  He claimed this was done in self-defense when the victim threatened him with a firearm.  The jury rejected that claim, found him guilty of first degree murder, and the court imposed a sentence of 26 years to life, which included a one-year enhancement for committing the offense with a deadly weapon.  On appeal, he claims the trial court prevented him from presenting his defense when it excluded evidence that the victim did not lawfully register his firearm.  He also claims that the court erred in modifying the self-defense jury instruction.  Finally, he claims the court abused its discretion in refusing to strike the deadly weapon enhancement.  We affirm.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

The prosecution charged defendant with first degree murder (Pen. Code, § 187, subd. (a)(1))[1] and personal use of a deadly weapon (a knife) (§ 12022, subd. (b)(1)) following an incident involving defendant's ex-partner, Cherron Tuoto.

*A. Prosecution's Case*

Tuoto and defendant were a couple for nearly 15 years and had two children together, M.J. and K.J. Tuoto worked with the decedent, Jai-Tu Keys, and they became lovers in 2012. Tuoto's relationship with Keys overlapped her relationship with defendant. Defendant often accused Tuoto of infidelity with Keys; she lied and denied the affair. In 2016, defendant and Tuoto argued over a text message she received from Keys. Tuoto moved out and continued her relationship with Keys.

Tuoto and defendant agreed on a co-parenting plan where M.J. lived with defendant and K.J. lived with Tuoto. They saw each other most evenings for dinner at defendant's house. Defendant and Tuoto also continued to have a sexual relationship. However, their relationship was "tough." Over the next few years, both defendant and Tuoto were romantically involved with other people, although Tuoto would not admit that to defendant. They each accused the other of doing more for other romantic partners. In this context, defendant referenced Keys the most; defendant knew Tuoto still spoke to Keys.

Not surprisingly, defendant and Keys were not friendly with one another. On one occasion, when Tuoto asked defendant about a mark or scar on his arm, defendant said he got it during an altercation with Keys at the 99 Cents store in 2017. During that altercation, Keys called defendant an "ugly, fat bitch." Defendant told Tuoto he chased Keys around the store, and Keys screamed "like a little bitch." Defendant told Tuoto he stabbed Keys, and Keys bit him.

---

[1] Undesignated statutory references are to the Penal Code.

Tuoto testified some of defendant's behavior scared her. On at least one occasion, defendant checked the mileage in Tuoto's car to see if she had gone home the day before, as she claimed, and confronted her about a discrepancy. Tuoto also said some of the text messages defendant sent to her were loving but she considered others to be abusive or toxic. At one point, Tuoto blocked defendant's number.

A day or two before the murder, defendant appeared uninvited and after midnight at Tuoto's house. He had waited for her to return from a night out. As she parked in front of her house, defendant drove up next to her. He asked her where she had been and accused her of being with another "boo," meaning man. She did not respond. Defendant said, "I get it," told her he loved her, and left. She told Keys about the incident.

Keys asked if Tuoto wanted to get a gun. She responded, "yeah, I think so." He told her she could get a gun "like his" for $700. He suggested she "go about it legitly, that way it's all up-and-up if anything should happen," which she understood to mean to buy it from a store and get a license. Keys expressed concern that something was "wrong" with defendant; perhaps he had a chemical imbalance. Keys texted Tuoto a photo of a gun that he said would fit in her purse. Two days before the murder, Keys texted her, "Next time he touches you, you touch him back." Tuoto admitted she did not tell anyone else about her troubles with defendant.

The night of the murder, Tuoto and defendant went together to M.J.'s football game. After returning home from the game, Tuoto declined defendant's request to come inside his house. This irritated and angered defendant. Defendant went into the trunk of Tuoto's car, purportedly to retrieve some belongings.[2] Tuoto left and drove her daughter home. Then she drove to Keys' residence.

Tuoto arrived at Keys' apartment complex around 12:30 a.m. Tuoto's sister had purchased $90 worth of marijuana from Keys and, the night of the murder, Tuoto was

_____

[2] Sheriff's deputies subsequently found defendant's cell phone under items in Tuoto's trunk. Live360, an application that provides a service of being able to track phones, had been installed on the phone the day before the murder.

there to pay him. According to Tuoto, Keys was not a drug dealer, although she told defendant he sold marijuana. She also knew Keys had a gun.

Keys met her in the parking lot and got into the passenger seat of her car. While they were talking, defendant approached them on foot. The street was fairly dark, but Tuoto could tell it was him as he grew closer. Tuoto froze and she and Keys remained silent. Defendant walked toward the front passenger side. Tuoto locked the car doors.

Defendant stood beside the passenger side of the car and stared inside. According to Tuoto, no words were exchanged. Defendant smashed the front passenger window and reached into the car. Keys leaned over and told Tuoto to drive. While Tuoto drove, defendant either ran alongside the car or hung onto it for a while but eventually let go. Keys looked at Tuoto and said, "he got me." Keys appeared to be badly wounded. His body swayed, then he stopped moving. Tuoto touched his sweatshirt and realized that he was bleeding. Tuoto drove Keys to the hospital.

Later, from her car, Tuoto spoke to her son, M.J., on the phone and told him that defendant had badly hurt Keys. Defendant got on the phone. Tuoto told defendant that Keys was badly hurt and that she was going to tell the police what he had done. Defendant asked her not to and urged her to come to his house, so he could clean the car and replace the window.

Defendant and Tuoto's son, M.J., testified that the night of the incident, defendant left the house after they got back from the football game. Defendant claimed he was going to the gas station. Later, at defendant's request, M.J. opened the garage door and saw defendant with a folding knife and blood on his hand. After the phone call with Tuoto, defendant washed the blood off his hands and showered. Defendant did not have any visible injuries other than a cut on his index finger.

Keys died from his injuries at 1:32 a.m. The cause of death was a single stab wound to his heart. Keys also had three stab wounds on his right arm.

B. *Defense's Case*

Defendant testified that he loved Tuoto and hoped they would get back together. He suspected she had cheated on him, including with Keys. Defendant was jealous and

4

hurt even though Tuoto never admitted her infidelity. Defendant also described Tuoto as jealous and angry about his romantic pursuits with other women. Defendant thought Tuoto was sending mixed messages: she sent defendant both complimentary and accusatory text messages and spoke to him about moving to Los Angeles together, while telling other people they were not a couple.

Defendant said he first met Keys when Keys came to defendant's work and insulted defendant. Keys called defendant an "ugly fat fuck," and said he better not catch defendant "slipping." Keys threatened him numerous times. In February of 2017, around Valentine's Day, Keys saw defendant at the 99 Cents store. Keys purported to be "the best she [Tuoto] had ever had" and took a swing at defendant. Defendant knocked Keys to the ground. Keys charged at defendant, with his keys between his knuckles. Defendant slammed him to the floor. Then Keys grabbed an icepick off a shelf on another aisle and stabbed defendant in the left bicep. Keys told defendant that he was lucky that he did not have his "Nina" with him, which defendant explained was slang for a nine-millimeter handgun.

The same year, Keys also threatened defendant in a grocery store. On a separate occasion that same year, Tuoto warned defendant not to look out his window (while they were at his house) or else Keys would "smoke" him. She held up a cell phone, purportedly showing a text from Keys with that same warning. In 2018, Keys threatened defendant at a car wash.

Defendant admitted that two nights before the charged offense, he knew that Tuoto was out for the evening. He suspected she was with Keys. He called Keys and also drove to Tuoto's house and waited for her to return. He thought he would be able to "be done with her" if he caught her with another man. Defendant claimed he never threatened Keys.

The night of the charged offense, defendant admitted that he tracked Tuoto to Keys' residence, using GPS tracking on the phone he had intentionally left in the trunk of her car earlier that day. After Tuoto took the freeway exit nearest Keys' home, defendant went to "catch her in the act." Defendant approached Tuoto's car on the driver's side and

5

asked for his cell phone. Keys told Tuoto to run over defendant. Defendant ran in front of her car to the sidewalk, by the passenger side front bumper.

Keys rolled down the window and spat on defendant. Then Keys reached for his waist and said, "do you want some of this?" Defendant said he swung and broke the car window, ducking at the same time. Keys grabbed defendant by his collar and dragged him down the street while Tuoto drove. Defendant's legs swayed between the car and the ground, leaving scuff marks on one shoe. Defendant claimed he was very afraid. He swung at the window because he was "scared for his life." Defendant had not intended to stab Keys, he just wanted Keys to release him. Defendant got free when Tuoto slammed on the brakes to avoid running into another car. Defendant fell to the ground, and ran home. Defendant later conducted an online search to find out if any violent crimes were reported in the area.

*C. Rebuttal Evidence*

In rebuttal, Tuoto explained that in 2016, defendant read a text on her cell phone from Keys that said, "gym time." Defendant believed Keys' text had a sexual connotation. He choked Tuoto and chased her out of the house. Then he tried to run over her with his SUV. She hid in the bushes. He lured her out, saying he just wanted to talk, and hit her hard on the right side of her face/head, knocking her to the ground. This incident prompted her to leave.

Tuoto said she suffered a concussion and "saw stars" for a week. For a month, clear fluid dripped from her nose, and fluid filled in her ear. She still has a lump on the back of her neck from the incident. Tuoto did not file a police report because she was afraid of defendant.

*D. Jury Instructions and Verdict*

The court instructed the jury regarding, inter alia, first degree murder, self-defense, voluntary manslaughter based on imperfect self-defense, and voluntary manslaughter based on provocation and heat of passion. The jury found defendant guilty of first degree murder and found true the allegation he personally used a deadly weapon.

On April 1, 2022, the trial court sentenced defendant to 25 years to life for the murder, plus one year for the weapon enhancement.

## DISCUSSION

### I

### *Evidence of an Unregistered Firearm*

Defendant contends the trial court abused its discretion and violated his federal constitutional rights to due process and to present a defense when it excluded documentary evidence that there was no record of Keys registering his firearm. He claims this evidence was relevant to explain Tuoto's testimony about legitimately purchasing a firearm, show Keys was unconcerned with following the law, and show Keys kept an illegal firearm that was not traceable and therefore he'd be more likely to use it against defendant. Defendant also argues that introduction of this evidence was relevant to the jury's determination of Tuoto's credibility. We disagree with defendant's contentions.

#### A. *Additional Background*

At the close of the evidentiary portion of trial, defense counsel moved the court to admit a certified copy of Keys' firearm registration record. The record showed that Keys did not have a registered firearm. Defense counsel argued the evidence was relevant for three reasons. First, it explained the text discussion between Tuoto and Keys regarding her purchase of a firearm. She asked Keys to get her a gun, and he suggested that she legally purchase a firearm because if she shot defendant, then the gun ownership would not be an issue. Next, Keys possessed an unregistered firearm, which meant he was breaking the law. Finally, Keys' possession of an unregistered firearm meant the firearm was untraceable and could not be linked to Keys should Keys harm defendant. According to defendant, the record provided strong evidence of Keys state of mind under Evidence Code section 1250.

After hearing argument, the trial court excluded the certified record as not relevant and, even if it had a limited relevance, outweighed by a risk of undue prejudice or confusion of the issues.

7

*B. Analysis*

Defendant raises both constitutional and statutory arguments against the exclusion of the firearm registration record. We first address defendant's statutory arguments. (See *People v. Leonard* (1983) 34 Cal.3d 183, 187 ["It is well established that 'we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us' "].)

Evidence is relevant, and therefore generally admissible, if it is "relevant to the credibility of a witness" or has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see also Evid. Code, § 351.) "A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects. [Citation.] An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 74.) A court's ruling will not be reversed on such matters unless it is shown " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 534.)

Contrary to defendant's contention, we conclude the evidence was not relevant to explain or provide context to Tuoto and Keys' text exchange regarding her purchase of a firearm. The conversation was self-explanatory; Keys and Tuoto thought she needed a firearm to protect herself from defendant and that she should go through the legal process to obtain one. Evidence that Keys did not have a registered firearm was, therefore, unnecessary to provide clarity to this discussion.

Defendant next argues that evidence that Keys never registered a firearm was relevant because it "showed that Keys had committed an illegal act with his gun ownership, and supported the defense theory that Keys was a person unconcerned about the law." Since Keys had access to an illegal and untraceable firearm, defendant argues,

8

it could be discarded once used against defendant. Defendant contends these circumstances demonstrate that his fear of Keys was reasonable, which both undermines the prosecution's theory that he planned the murder and supports his own theory of self-defense. We disagree.

First, we note that evidence that Keys was unconcerned about the law was already before the jury. Tuoto testified that her sister had purchased marijuana from Keys. Despite Tuoto's claim that Keys was not a drug dealer, the jury was free to conclude otherwise.

Secondly, to properly assess defendant's claim of self-defense, the jury had to determine whether defendant honestly and reasonably feared for his life such that his use of deadly force was justified. (*People v. Trevino* (1988) 200 Cal.App.3d 874, 879 (*Trevino*) [self-defense requires only that the killing itself be based solely on a reasonable and honest belief in the need to defend himself against (the victim's) threat of imminent harm].) There was evidence within the record that, if believed by the jury, supported defendant's theory.

Specifically, defendant knew Keys sold marijuana and had a firearm and, thus, was willing to engage in illegal activity. Tuoto warned defendant that Keys would "smoke" him. Keys also purportedly directly threatened defendant, saying that he wished he had his gun with him and that he better not catch defendant "slipping." On the night of the murder, defendant confronted Keys and Tuoto on a dark street. Defendant considered himself to be in a vulnerable position, especially when Keys purportedly spat on him then threatened him by reaching for his waistband and asking if defendant "want[ed] some of this." Defendant testified that he feared for his life and, with a knife in hand, swung to protect himself. According to defendant, Keys still grabbed defendant by his collar and dragged him down the street as Tuoto drove. Keys' threats coupled with references to his firearm, if believed by the jury, could suggest Keys' willingness to engage in violent behavior. The fact that Keys did not *register* this or any other firearm did not have a tendency to support defendant's claim of self-defense, especially since

9

there was no evidence in the record that defendant knew whether Keys' firearm was registered.

Here, the issue was whether it was honest and reasonable for defendant to believe he was in imminent danger as a result of Keys' threatening him with a firearm, not whether Keys legally possessed a firearm. Because there was no evidence that defendant knew Keys' firearm was not registered, this evidence fails to support defendant's theory that this fact would have contributed to his fear of Keys. Thus, failing to complete the administrative task of registering a firearm may show an unwillingness to abide by the law but is far too attenuated to prove or disprove that Keys was more willing to use the firearm in an offensive and violent manner toward defendant. As the trial court concluded, the fact that Keys' firearm was not registered was not relevant to whether defendant acted in self-defense.

Nor was the firearm registration record relevant to impeaching Tuoto. First, the firearm registration record did nothing to rebut Tuoto's testimony that Keys possessed a firearm. Second, Tuoto did not indicate any direct knowledge of whether the firearm she saw in Keys' possession was legally owned. (See Evid. Code, § 702.) Thus, the proffered firearm registration record was not relevant for impeachment purposes. (Cf. *People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10 [because the relevant issue in the case was whether a witness was actually on the roof at the time of the murder and saw the murder, whether he had permission to use the roof was not relevant impeachment evidence].)

We therefore conclude that the trial court did not abuse its discretion in excluding evidence of defendant's failure to register a firearm.

Additionally, we reject defendant's contention that the trial court's ruling deprived him of his federal constitutional rights to present a defense and to due process. Defendant forfeited this contention by not raising it below, and it lacks merit in any event. " 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' (*People v. Hall* (1986) 41 Cal.3d 826, 834.)" (*People v. Blacksher* (2011) 52 Cal.4th 769, 821.) Defendant was not precluded from being able to portray his assault on Keys as a panicked attempt to protect

himself rather than an act of premeditated murder.  Under these circumstances, defendant fails to persuade us that the court's ruling prejudiced his ability to defend his case.

## II

### *Self-Defense Instruction*

Defendant testified that he stabbed Keys in self-defense.  He also testified that he felt compelled to determine whether Tuoto was seeing other men.  During closing argument, defense counsel argued the killing was justified in self-defense but, in the alternative, argued that defendant was provoked and acted in the heat of passion.  The jury was instructed on self-defense pursuant to CALCRIM No. 505, voluntary manslaughter (imperfect self-defense) pursuant to CALCRIM No. 571, and voluntary manslaughter (heat of passion) pursuant to CALCRIM No. 570.  On appeal, defendant contends the trial court prejudicially erred by modifying CALCRIM No. 505, because it confused the issues for the jury.  We conclude the trial court's instruction was a correct statement of the law.

### A.  Additional Background

After the close of the evidentiary portion of the trial, the prosecutor requested a modification to CALCRIM No. 505 to add language stating:  "Self-defense is not available when a person does not act out of fear alone, but out of fear and a desire to harm the attacker."  The prosecutor cited to *People v. Nguyen* (2015) 61 Cal.4th 1015 (*Nguyen*) as support for his request.  Defense counsel objected to the modification but, in the alternative, argued that any modification "should be more complete."  Defense counsel argued that, as written, CALCRIM No. 505 sufficiently and completely instructed the jury on the law regarding self-defense.  Defense counsel noted that the pattern instruction was consistent with the prosecutor's argument that when defendant stabbed Keys, he could not be acting on his hatred toward Keys; to qualify as self-defense, defendant could only be acting out of fear.  The defense argued that the modified language was misleading and had the potential to confuse the jury.

11

The prosecutor responded that the modification was an accurate statement of the law, not long or confusing, and helpful to the jury. The court stated, "Okay. And that's essentially the reasoning that I'm adopting or including that." The court overruled defense counsel's objection to the modification of CALCRIM No. 505 but included additional language to honor defense counsel's request for a "more complete" instruction. The court stated the wording was "not exactly what the defense proposed, but is what, thus far, I am settling on after reviewing the *Nguyen* case." The court noted that the additional language to be included was "very similar to" that used in *Nguyen*. The court granted the request to modify the instruction, noting that a defendant was not precluded from having other emotions, such as hatred toward the victim, as long as those are not causal factors in the killing.

CALCRIM No. 505, as modified, set forth as follows with the added portions italicized for ease of reference:

> "The defendant is not guilty of murder if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if: [¶] 1. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury. [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger. [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger.

> "Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

> "When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a

12

reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"If you find that Jaitu Keys threatened or harmed the defendant in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.

"Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person.

"A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating.

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"*A person acting in self-defense is not precluded from feeling anger or other negative emotions towards the victim so long as those emotions were not causal factors in the decision to use deadly force. Self-defense is not available when a person does not act out of fear alone, but out of fear and a desire to harm the attacker.*

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter." (Italics added to note modified language, all others omitted.)

*B. Analysis*

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' (*People v. St. Martin* (1970) 1 Cal.3d

13

524, 531.)" (*People v. Breverman* (1998) 19 Cal.4th 142, 154, abrogated on another ground by amendments to § 189.) Defendant objected to the modification, arguing it unnecessarily modified an already correct statement of law such that it created a danger the jury would be confused or mislead. This argument is sufficient to preserve his challenge to the modified instruction as affecting his substantial rights. Accordingly, we review his claim of legal error de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.) In so doing, we ascertain the relevant law, determine the meaning of the instructions, and determine whether the instructions correctly conveyed the law to the jury. (*People v. Kelly* (1992) 1 Cal.4th 495, 525.)

In its original form, CALCRIM No. 505 states in part that a defendant is justified in killing somebody in self-defense if the defendant "believed there was imminent danger of death or great bodily injury to himself," and the defendant "acted only because of that belief." The instruction is based on sections 197 and 198. Section 197 states a homicide is justifiable "[w]hen committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony . . . ." Section 198 adds "the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone."

This plain language clearly dictates that, for a homicide to be justified, objectively reasonable fear must be a defendant's sole motive for killing. Indeed, California authority dating back more than a century establishes that self-defense is available only to those who kill solely out of a reasonable fear of great bodily injury or death. (See *People v. Ye Park* (1882) 62 Cal. 204, 207-208 [self-defense instruction requiring acquittal if the defendant acted on the basis of reasonable fears held properly refused, because " 'the party killing must have acted under the influence of such fears *alone*' "]; *People v. Hecker* (1895) 109 Cal. 451, 463 [conduct of person acting in self-defense "must not be in revenge" and must be "in good faith to the sole end of winning his safety and securing his life"], superseded by statute on other grounds as stated in *People v. Hardin* (2000)

14

85 Cal.App.4th 625, 633-634; *People v. Levitt* (1984) 156 Cal.App.3d 500, 509 ["if the degree of force used was influenced by any motivations aside from a belief in the necessity to act in self-defense, then manslaughter was an appropriate verdict" for a defendant who killed wife's paramour], disapproved on other grounds in *People v. Johnson* (2016) 62 Cal.4th 600, 649, fn. 6; *People v. Vernon* (1925) 71 Cal.App. 628, 629 [upholding modification to requested instruction that limited self-defense to killing under the influence of fear " 'alone' "].)

Defendant agrees CALCRIM No. 505 correctly states the law on the theory of self-defense and section 198, as it requires the jury to find that the defendant reasonably believed he or she was in imminent danger of harm and must have acted on that fear. However, he contends the modifications "added unnecessary elements that likely confused and misled the jury as to what it must find for self-defense to apply." He claims that by telling the jury that the defendant cannot act out of fear *and* a desire to harm the attacker, it required the jury to parse the facts too finely, likely leading to confusion. He argues this undermined his defense where the jury was also asked to determine whether defendant acted upon provocation in the heat of passion. The latter theory would involve intense emotions—including anger or hatred—that cause a person to act without due deliberation and reflection. Because there was a question of whether defendant was motivated to stab Keys based solely on fear or a combination of motives, defendant argues the modified language could have prompted the jury to use an alternate theory to reject his self-defense claim. To avoid this, defendant argues, the jury should have been instructed with the standard pattern instruction CALCRIM No. 505.

In *Trevino, supra*, 200 Cal.App.3d at pages 878-879, the appellate court rejected the defendant's argument that, when the circumstances of the case suggest mixed motives for the killing, the jury should not be instructed that self-defense only applies when the defendant is motivated by fear alone. The *Trevino* court explained the law does not preclude self-defense merely because "a person . . . feels anger or even hatred toward the

15

person killed." (*Id.* at p. 879.) "The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense. But if the only causation of the killing was the reasonable fear that there was imminent danger of death or great bodily injury, then the use of deadly force in self-defense is proper, regardless of what other emotions the party who kills may have been feeling but not acting upon." (*Ibid.*; see also *People v. Shade* (1986) 185 Cal.App.3d 711, 716 [rejecting the argument that the jury was not properly instructed when it was told the killer must have acted out of fear alone for self-defense to apply].)

More recently, our Supreme Court drew this same distinction between actions and emotions when it held a defendant is not entitled to assert self-defense if "he did not act on the basis of fear alone but also on a desire to kill his rival." (*Nguyen, supra*, 61 Cal.4th at p. 1044.) In *Nguyen*, the defendant shot and killed a rival gang member who, carrying a firearm, approached the car the defendant was driving. (*Id.* at p. 1043.) The defendant contended that the evidence established self-defense as a matter of law. (*Id.* at p. 1042.) The trial court instructed the jury with CALJIC No. 5.12, a prior version of the instruction regarding justifiable homicide in self-defense. (*Nguyen*, at p. 1043.) Our Supreme Court quoted sections 197 and 198, and cited *Trevino*'s holding that " 'an instruction which states that the party killing must act under the influence of such fears alone, is a correct statement of the law.' " (*Nguyen*, at p. 1045, quoting *Trevino, supra*, 200 Cal.App.3d at p. 879.) The court recognized: "*Trevino* clarified that this rule does not 'imply that a person who feels anger or even hatred toward the person killed, may never justifiably use deadly force in self-defense,' " only " 'that the party killing *act* out of fear alone.' " (*Nguyen*, at p. 1045.) The court concluded that "it was for the jury to decide whether [the] defendant acted out of fear alone when he shot and killed [the victim]." (*Ibid.*)

16

We recognize that the *Nguyen* court remarked on an issue that was not before it: "We note that defendant did not argue . . . that the jury should have been instructed that acting based on mixed motives is permissible so long as reasonable fear was the but-for cause of his decision to kill. We therefore have no occasion to consider whether such a rule would be consistent with section 198 as interpreted in *Trevino* or other cases." (*Nguyen, supra*, 61 Cal.4th at p. 1046.) Yet the reasoning in *Nguyen* and *Trevino* leads us to conclude that the modified language is consistent with the law.

Section 198 requires self-defense to be based on a reasonable fear alone. (*Nguyen, supra*, 61 Cal.4th at pp. 1044-1045; *Trevino, supra*, 200 Cal.App.3d at p. 879.) The modified language told the jury how to determine whether self-defense applied to a case where defendant harbored multiple emotions. It does not preclude a defendant from harboring anger or hatred of the victim for self-defense to apply, so long as the defendant does not act on those emotions in using deadly force. (See *Nguyen*, at p. 1044 [holding self-defense is not available to a defendant who does not "act on the basis of fear alone but also on a desire to kill his rival"].) As the court recognized in *Trevino*, the instruction given here did not inform the jury that it had to reject self-defense if defendant harbored feelings other than fear. Rather, the instruction required that defendant's fear for his life be reasonable and caused the killing.

Defendant also fails to convince us that the modified self-defense instruction confused and misled the jury in regard to the voluntary manslaughter instructions. The jury was instructed on voluntary manslaughter with imperfect self-defense. "The subjective elements of self-defense and imperfect self-defense are identical. Under each theory, the appellant must actually believe in the need to defend himself against imminent peril to life or great bodily injury." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262.) "If the trier of fact finds the requisite belief in the need to defend against imminent peril, the choice between self-defense and imperfect self-defense properly turns upon the trier of fact's evaluation of the reasonableness of appellant's belief." (*Ibid.*)

17

Because the modified language in CALCRIM No. 505 does not pertain to the reasonableness of defendant's belief regarding imminent danger, the additional language did not confuse the issue related to imperfect self-defense.

The jury was also instructed on voluntary manslaughter based on heat of passion. In determining whether defendant committed voluntary manslaughter under a heat of passion theory, the jury had to determine defendant was provoked and, as a result, "acted rashly and under the influence of intense emotion that obscured his reasoning or judgment," and that the "provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (CALCRIM No. 570.) Unlike in self-defense, any violent or intense emotion that causes a person to act without due deliberation and reflection can motivate acts in the heat of passion. The modified language in the self-defense instruction refers only to the emotion that motivates the killing, it does not reference acting without deliberation or reflection. Thus, the modified instruction did not confuse the issues between self-defense and voluntary manslaughter based on heat of passion.

Because we conclude that the challenged instruction was a correct statement of law, we reject defendant's arguments that giving the instruction affected his substantial rights.

### III

### *Weapon Enhancement*

Defendant argues the trial court abused its discretion in denying his request to strike the one-year weapon enhancement. The People disagree, arguing there are several factors that support the trial court's decision to impose the year-long enhancement.

#### A. *Additional Background*

At the sentencing hearing, defense counsel asked the trial court to strike the one-year weapon enhancement. He argued the following reasons justified striking it: "One is [defendant's] age. The fact that he is in his mid 50s. Also the fact that before this

18

incident occurred, he was a family man.  He was taking care of his children.  He was working.  And he lived a crimeless life.  There were really -- there was no criminal history for [defendant] before this incident occurred."  The court declined the request, stating "So I'm going to impose the sentence which is consistent with the maximum sentence that I can impose under the law.  [Defendant], you are committed to state prison for an indeterminate term of 25 years to life.  And based on your conviction under 12022(b) for the deadly weapon enhancement, I am going to impose an additional one-year determinate term consecutive to that, for a total of 26 years to life.  [¶]  I have considered the request made by [defense counsel], and I'm declining to strike that enhancement."

### B.  Analysis

We review a trial court's order denying a motion to dismiss a sentence enhancement under section 1385 for abuse of discretion.  (*People v. Carmony* (2004) 33 Cal.4th 367, 373-374.)  A trial court may abuse its discretion where "its decision is so irrational or arbitrary that no reasonable person could agree with it," "where the trial court was not 'aware of its discretion' " to dismiss a sentencing allegation under section 1385, or "where the court considered impermissible factors in declining to dismiss."  (*Id.* at pp. 377, 378.)

Effective January 1, 2022, Senate Bill No. 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1) amended section 1385[3] "to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice."  (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.)  As amended, section 1385, subdivision (c) now provides in relevant part:

---

[3]  We note that a subsequent enactment, Assembly Bill No. 200 (2021-2022 Reg. Sess.) (Stats. 2022, ch. 58, § 15), which took effect on June 30, 2022, made technical, nonsubstantive changes to section 1385 that do not affect the issues on appeal.

"(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

"(2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.

"(A) Application of the enhancement would result in a discriminatory racial impact as described in paragraph (4) of subdivision (a) of Section 745." (§ 1385, subd. (c)(1)-(2)(A).)

Initially, we note that defendant was sentenced after the effective date of Senate Bill No. 81; it is indisputable the amended law applied to defendant at sentencing. Defendant argues that under the amended statute, the mitigating circumstance present in this case was under section 1385, subdivision (c)(2)(A): application of the enhancement would result in a discriminatory racial impact. At sentencing, however, he did not assert that mitigating circumstance existed or offer any evidence to prove it. It was his duty to do so under the statute in order to trigger the court's obligation to consider it. (§ 1385, subd. (c)(2).) By failing to raise the issue during sentencing, we conclude he has forfeited this issue. (See *People v. Scott* (1994) 9 Cal.4th 331, 353 [the appellant forfeited his sentencing claims because he did not object at the time of sentencing]; *People v. Sperling* (2017) 12 Cal.App.5th 1094, 1100 [forfeiture applies to failing to argue mitigating factors].)

We acknowledge the circumstances listed in paragraph (2) are not exclusive (§ 1385, subd. (c)(4)), and the specification of mandatory factors did not displace the trial court's obligation to exercise discretion in assessing whether dismissal is in the

furtherance of justice.  (§ 1385, subd. (c)(1)-(2).)  The statute requires that when a court dismisses an enhancement, "[t]he reasons for the dismissal shall be stated orally on the record.  The court shall also set forth the reasons in an order entered upon the minutes if requested by either party."  (§ 1385, subd. (a).)

Defendant notes that when the court denied defendant's motion to strike the enhancement, it did not state any reasons for the denial.  Rather, the court simply stated it had considered the motion to strike the enhancement and denied it.  Defendant now claims that, whatever factors the court relied upon, it abused its discretion.  We decline defendant's implicit invitation to speculate as to the trial court's reasoning.  Because the statute only requires the court to state the reasons for *dismissing* an enhancement to be placed on the record, it was defendant's obligation to request a clarification of the court's ruling in order to challenge the basis for that ruling on appeal.  "A defendant, or his or her counsel, must object at the time of sentencing if the trial court does not state any reasons or a sufficient number of reasons for a sentencing choice or double-counts a particular sentencing factor, and, if there is no objection, any error is deemed waived and cannot be challenged for the first time on appeal."  (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1371, citing *People v. Scott, supra*, 9 Cal.4th 331.)  Here, defendant did not request a clarification or inquire into the reasons for the court's sentencing choice and the issue cannot be raised on appeal.  Moreover, under the facts of this case including where the trial court considered the factors in mitigation raised by defendant, we cannot say the trial court's "decision is so irrational or arbitrary that no reasonable person could agree with it."  (*People v. Carmony, supra*, 33 Cal.4th at p. 377.)

21

## DISPOSITION

The judgment is affirmed.

/s/
EARL, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
HULL, J.